Battleground Veterinary Hosp., P.C. v. McGeough, 2007 NCBC 33

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 18918

BATTLEGROUND VETERINARY
HOSPITAL, P.C. and VETCOR
PROFESSIONAL PRACTICES, LLC,

Plaintiffs,

v.

MARK MCGEOUGH and SARAH
MCGEOUGH,

Defendants.

**ORDER**

*Jackson Lewis, LLP by Paul H. Derrick and Kimberly A. Doyle for Plaintiffs Battleground Veterinary Hospital, P.C and VetCor Professional Practices, LLC.*

*Law Office of Jacqueline M. Druar, PLLC by Jacqueline M. Druar and Law Offices of Robert M. Axelrod by Robert M. Axelrod for Defendants Mark McGeough and Sarah McGeough.*

Diaz, Judge.

I.

STATEMENT OF THE CASE

{1}     Plaintiffs in this case contend Defendants (both of whom are veterinarians) breached certain covenants not to compete after they resigned as employees of Plaintiff Battleground Veterinary Hospital, P.C. ("Battleground").

{2}     Plaintiffs allege claims for (1) breach of contract, (2) breach of fiduciary duty of loyalty, (3) aiding and abetting breach of fiduciary duty of loyalty, (4) unfair and deceptive trade practices, (5) misappropriation of trade secrets, (6) tortious interference with contract, and (7) civil conspiracy.  (Compl. ¶¶ 37–77.)

{3}     Before the Court are the parties' cross-motions for summary judgment.

## II.

## CONTENTS OF THE PARTIES

{4}     According to Plaintiffs, Defendants are former employees who, despite executing covenants not to compete, operate Birkdale Animal Hospital ("Birkdale"), a veterinary practice that competes directly with Battleground's clinics.

{5}     Plaintiffs also allege Defendants encouraged each other to ignore their covenants and breached their fiduciary duties to Plaintiffs by, among other things, co-opting resources and time that should have been devoted to promoting Battleground's interests and using them instead to establish Birkdale. Additionally, Plaintiffs accuse Defendants of misappropriating Plaintiffs' trade secrets to facilitate the development of their new practice and wrongfully soliciting Battleground's clients and employees.

{6}     Between 12 May 2003 and 23 July 2005, Mark McGeough served as Battleground's sole shareholder, officer, and director.  Mark McGeough contends that during this time period, he "nullified" the covenants not to compete that purported to bind Defendants, and that he had full authority to do so by virtue of his sole control of Battleground.

{7}     Alternatively, Defendants argue the restrictive covenants by their terms apply only when an employee is terminated.  Because they both resigned, Defendants contend they are not bound by the covenants.

{8}     As for the tort claims alleged in Plaintiffs' Complaint, Defendants assert that, as Battleground's sole shareholder, officer, and director during the time of the acts that form the basis of Plaintiffs' claims, Mark McGeough could do as he wished with Battleground's assets, and therefore neither he nor his co-defendant may be held liable in tort.

III.

SUMMARY OF DECISION

{9} The Court **GRANTS** Defendants' motion for summary judgment as to all claims alleged by Battleground.

{10} The Court **GRANTS** Defendants' motion for summary judgment as to the Second and Third Causes of Action asserted by VetCor Professional Practices, LLC ("VetCor") for breach of fiduciary duty and aiding and abetting the same.

{11} The Court **GRANTS** Defendants' motion for summary judgment as to VetCor's Fifth Cause of Action alleging misappropriation of trade secrets.

{12} In all other respects, however, the parties' cross-motions for summary judgment are **DENIED**.

IV.

PROCEDURAL HISTORY

{13} Battleground filed its Complaint on 19 October 2005.

{14} Defendants filed their answer on 28 December 2005.

{15} On 19 May 2006, Superior Court Judge Forrest D. Bridges denied Battleground's motion for a preliminary injunction, although he required Defendants to (1) return a customer list taken from Battleground, (2) refrain from soliciting those customers on the list, (3) return certain customer records to Battleground, (4) make any future requests for records in the same manner as is customary in the veterinary community, and (5) advise those customers whose records were returned to Battleground of the Court's order.

{16} On 30 May 2006, VetCor moved to intervene as a party plaintiff.

{17} On 1 June 2006, the matter was transferred to the North Carolina Business Court as a complex business case and assigned to me.

{18} Defendants filed an amended answer on 16 August 2006.

{19} On 19 October 2006, the Court entered a consent order granting VetCor's motion to intervene.

{20} On 7 May 2007, Defendants moved for summary judgment as to all claims and filed a supporting brief.

{21} On 31 May 2007, Plaintiffs also moved for summary judgment as to all claims and filed a supporting brief.

{22} On 20 June 2007, both sides filed briefs in opposition to the cross-motions for summary judgment.

{23} On 27 June 2007, Plaintiffs filed a reply in support of their motion for summary judgment.

{24} On 28 June 2007, Defendants filed a reply in support of their motion for summary judgment.

{25} The Court heard oral arguments on the motions on 30 July 2007.

V.

SUMMARY OF THE FACTS[1]

A.

THE PARTIES

{26} Battleground is a North Carolina corporation with its principal place of business in Mecklenburg County, North Carolina. (Compl. ¶ 1.) It operates several veterinary clinics throughout North Carolina. (Compl. ¶ 2.)[2]

{27} VetCor is a Delaware limited liability company. (Defs. Mot. Summ. J. Ex. Q.)

{28} VetCor and Battleground are affiliated companies. (Pls. Mot. Summ. J. Exs. 2–3.)

{29} VetCor serves as Manager of Battleground's clinics pursuant to an Administrative Services Agreement (the "ASA") between it and Battleground. (Pls. Mot. Summ. J. Ex. 1.)

---

[1] Unless otherwise noted, the facts set forth herein are undisputed.
[2] At some point following the filing of this action, Battleground changed its name to North Carolina Veterinary Services, P.C. (DeFeo Dep. 4:10–18.)

{30}    The ASA (and its various amendments) allocates responsibility for Battleground's operation between the provision of professional and administrative services.[3]  Responsibility for the former is vested solely in Battleground and its professional personnel, while control of the latter resides exclusively with VetCor. (Pls. Mot. Summ. J. Ex. 1; Defs. Mot. Summ. J. Ex. Q.)

{31}    As Manager, VetCor's duties under the ASA include (1) hiring and training all administrative personnel, (2) establishing guidelines for hiring all professional personnel, (3) preparing budgets, maintaining records, and managing patient billings, (4) purchasing equipment and supplies (with VetCor retaining ownership of said property), and (5) locating and maintaining appropriate facilities for the practice.  (Pls. Mot. Summ. J. Ex. 1.)

{32}    In exchange for providing these services, VetCor is paid an annual fee and is entitled to reimbursement of certain expenses.  (Pls. Mot. Summ. J. Ex. 1.)

{33}    Defendants are veterinarians who practice in North Carolina.  (Compl. ¶¶ 16–17.)

{34}    Defendants are married.  (Compl. ¶ 3.)

B.

THE CLAIMS

1.

SARAH MCGEOUGH'S COVENANT

{35}    On 8 January 2001, Sarah McGeough began work as an associate veterinarian in Battleground's Charlotte, North Carolina clinic.  (Compl. ¶ 17; Sarah McGeough Aff. ¶ 4.)

{36}    Plaintiffs allege Sarah McGeough signed a covenant on her first day of employment that, among other things, prevented her, for twelve (12) months from the date of **termination** of her employment, from (1) engaging in a competitive veterinary practice anywhere within a ten (10) mile radius of Battleground's

---

[3] This allocation is a function of North Carolina law, which provides that veterinary services may only be rendered by a properly licensed veterinarian.  *See* N.C. Gen. Stat. §§ 90-187.11–187.12 (2005).

Charlotte clinic,[4] (2) soliciting clients or employees of Battleground, either for her own benefit or that of any other person or entity, or (3) taking any action that would, directly or indirectly, be detrimental to Battleground or would benefit a competitor of Battleground.  (Compl. ¶¶ 17–18; Pls. Mot. Summ. J. Ex 3.)

{37}    Sarah McGeough also agreed in her covenant to keep Battleground's confidential and proprietary information "in confidence and trust" and to not disclose it either during her employment or after her **termination**.  (Pls. Mot. Summ. J. Ex. 3.)

{38}    Sarah McGeough's covenant states that her employer for purposes of the covenant shall be deemed to include Battleground and "its direct or indirect subsidiaries and affiliates."  (Pls. Mot. Summ. J. Ex. 3.)

{39}    Sarah McGeough contends the covenant formed no part of her initial employment negotiations with Battleground.  (Sarah McGeough Aff. ¶ 5.)

{40}    She further alleges that (1) Battleground did not present her with the covenant until sometime in February 2001, (2) she was offered no additional consideration for signing it, and (3) although the covenant's signature block is dated 8 January 2001, she did not sign the document until 12 March 2001, the same day she signed a separate offer of employment detailing her compensation and fringe benefits package.  (Pls. Mot. Summ. J. Ex. 7; Sarah McGeough Aff. ¶ 5.)[5]

{41}    Sarah McGeough was promoted to Chief of Staff of the Battleground Charlotte clinic in or around September 2001.  (Sarah McGeough Dep. 72:19–73:1.)

2.

MARK MCGEOUGH'S COVENANT

{42}    Plaintiffs allege Mark McGeough began working for Battleground as Chief of Staff of Battleground's Concord, North Carolina facility on or about 1 February 2001, and that he executed a covenant not to compete that same day.  (Compl. ¶ 16.)

---

[4] Birkdale is 9.2 miles away from Battleground's Charlotte clinic.  (Order Prelim. Inj. ¶ 18.)
[5] Sarah McGeough's offer of employment refers specifically to the separate covenant.  (Pls. Mot. Summ. J. Ex. 7.)

{43}   Mark McGeough's covenant prevented him, for twelve (12) months from the date of **termination** of his employment, from (1) engaging in a competitive veterinary business anywhere within a nine (9) mile radius of Battleground's Concord clinic,[6] (2) soliciting clients or employees of Battleground, either for his own benefit or that of any other person or entity, or (3) taking any action that would, directly or indirectly, be detrimental to Battleground or would benefit a competitor of Battleground.  (Pls. Mot. Summ. J. Ex 2.)

{44}   Mark McGeough further agreed to keep Battleground's confidential and proprietary information "in confidence and trust" and to not disclose it either during his employment or after his **termination**.  (Pls. Mot. Summ. J. Ex. 2.)

{45}   Mark McGeough's covenant states that his employer for purposes of the covenant includes Battleground and "its direct or indirect subsidiaries and affiliates (including, without limitation, VetCor Professional Practices LLC)."  (Pls. Mot. Summ. J. Ex. 2.)

{46}   According to Mark McGeough, he did not begin work for Battleground until 23 March 2001 and did not sign the covenant until 9 April 2001.  (Mark McGeough Dep. 44:6–46:23.)  The signature page of his covenant, however, is dated 16 February 2001.  (Pls. Mot. Summ. J. Ex. 2.)

{47}   Both covenants state that they may not "be amended, modified or waived except by a written instrument duly executed by the person against whom enforcement of such amendment, modification, or waiver [is] sought."  (Pls. Mot. Summ. J. Exs. 2–3.)

3.

DEFENDANTS' ALLEGED BREACHES

{48}   On or about 12 May 2003, Mark McGeough acquired all the shares of Battleground and became its sole officer and director.[7]  (Defs. Am. Answer ¶ 1; Defs. Mot. Summ. J. Exs. J, L.)

---

[6] Plaintiffs conceded at oral argument that Mark McGeough did not violate this geographic restriction, as Birkdale is approximately 18 miles from the Battleground Concord clinic.
[7] The record does not disclose what consideration Mark McGeough paid to acquire his interest in Battleground.

{49}   On that same day, Mark McGeough gave a company named VetCor of Concord, LLC an unconditional and irrevocable option to purchase his ownership interest in Battleground for $100.00.  (Pls. Mot. Summ. J. Ex. 6.)  McGeough also signed a separate escrow agreement wherein he promised to use reasonable efforts to cause Battleground to fulfill its obligations under the ASA.  (Defs. Mot. Summ. J. Ex. K.)[8]

{50}   On or about 16 December 2004 (while serving as Battleground's sole shareholder, officer, and director), Mark McGeough executed a document purporting to nullify the covenants.  (Mark McGeough Aff. ¶ 8.)  Plaintiffs allege they did not know about McGeough's action until sometime in January 2006.  (DeFeo Dep. 145:6–147:3.)[9]

{51}   Sometime in February 2005, Sarah McGeough took maternity leave from her employment with Battleground.  She submitted her formal resignation effective 4 May 2005.  (Sarah McGeough Dep. 130:6–133:8.)

{52}   Mark McGeough resigned his employment with Battleground on or about 23 July 2005.  (Mark McGeough Aff. ¶ 9.)

{53}   On 4 August 2005, Defendants opened Birkdale.  (Compl. ¶¶ 21–22; Sarah McGeough Aff. ¶¶ 9–10; Mark McGeough Aff. ¶¶ 10–11.)

{54}   Beginning in January 2005, Mark McGeough began laying the groundwork for Birkdale.  The planning work included meetings with lenders and others during what would have been his normal working hours at Battleground's Concord clinic.  Both Defendants culled customer information from Battleground's records, including, in some instances, the amounts particular clients spent on veterinary care.  Defendants also used Battleground's resources to prepare customer lists and address labels that were then used to create mailings announcing the opening of Birkdale.  Finally, McGeough let several Battleground

---

[8] The escrow agreement also refers to the execution of "the Administrative Services Agreement dated as of the date hereof by and between the Manager and [Battleground.]"  McGeough never executed an ASA.

[9] On 12 January 2006, VetCor purported to rescind Mark McGeough's nullification notice.  (Defs. Mot. Summ. J. Ex T.)

employees know that he would hire them at his new practice, and at least one such employee accepted employment with Birkdale. (Compl. ¶¶ 23–25, 27–28; Mark McGeough Dep. 115:15–117:2, 139:21–140:12, 148:15–151:2, 154:8–156:5, 175:5–176:14, 182:22–183:13; Sarah McGeough Dep. 52:7–53:25, 79:19–83:24, 149:21–151:20.)

{55} On or about 18 August 2005 (almost a month after Mark McGeough resigned), VetCor of Concord, LLC exercised its option to purchase Mark McGeough's interest in Battleground. (Defs. Mot. Summ. J. Ex. O.)

{56} Defendants do not dispute the facts surrounding their activities in organizing Birkdale. Defendants do dispute the enforceability of the covenants. They also dispute that any information they used to develop and open Birkdale was in fact confidential and proprietary. Finally, Defendants assert they owed no fiduciary duties to VetCor or Battleground and, as a result, all claims that flow from that premise fail as a matter of law.


VI.

PRINCIPLES OF LAW

A.

SUMMARY JUDGMENT STANDARD

{57} Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2005).

{58} The moving party bears the burden of showing a lack of any triable issue of fact. *Collingwood v. Gen. Elec. Real Estate Equities, Inc.,* 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989) (citing *Caldwell v. Deese*, 288 N.C. 375, 218 S.E.2d 379 (1975)). Once the moving party meets this burden, the nonmoving party must "produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a prima facie case at trial." *Id.*

{59}     Summary judgment, however, is a drastic remedy that should be granted cautiously.  *First Fed. Sav. & Loan Ass'n v. Branch Banking & Trust Co.,* 282 N.C. 44, 50, 191 S.E.2d 683, 688 (1972).  Where the slightest doubt exists as to the merits of the motion, it should be denied.  *Volkman v. DP Assocs.,* 48 N.C. App. 155, 157, 268 S.E.2d 265, 267 (1980).

B.

BREACH OF CONTRACT

{60}     The intention of the parties to a contract controls the interpretation of the contract.  *Fidelity Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986) (citing *Lineberry v. Trust Co.,* 238 N.C. 264, 77 S.E.2d 652 (1953)).  As the North Carolina Court of Appeals has explained,

> [i]f the language of a contract is clear and only one reasonable interpretation exists, the courts must enforce the contract as written and cannot, under the guise of interpretation, rewrite the contract or impose terms on the parties not bargained for and found within the contract.  If the contract is ambiguous, however, interpretation is a question of fact, and resort to extrinsic evidence is necessary.  An ambiguity exists in a contract if the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties.  Thus, if there is any uncertainty as to what the agreement is between the parties, a contract is ambiguous.

*Crider v. Jones Island Club, Inc.*, 147 N.C. App. 262, 266–67, 554 S.E.2d 863, 866–67 (2001) (internal citations, alteration, footnote, and quotation marks omitted).

{61}     "Under North Carolina law, a covenant not to compete is valid and enforceable if it is:  (1) in writing; (2) made a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest of the employer."  *Okuma Am. Corp. v. Bowers*, 638 S.E.2d 617, 620 (2007) (citing *Farr Assocs., Inc., v. Baskin*, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000)).

{62}     "When the relationship of employer and employee is established before the covenant not to compete is signed there must be consideration for the covenant such as a raise in pay or a new job assignment."  *Whittaker Gen. Med. Corp. v. Daniel,*

324 N.C. 523, 527, 379 S.E.2d 824, 827 (1989) (citing *Chemical Corp. v. Freeman*, 261 N.C. 780, 136 S.E.2d 118 (1964)).

{63} Nevertheless, if a covenant not to compete "is a part of an original verbal employment contract, it will be considered to be based on valuable consideration." *Young v. Mastrom, Inc.,* 99 N.C. App. 120, 123, 392 S.E.2d 446, 448 (1990) (citing *Robins & Weill v. Mason*, 70 N.C. App. 537, 320 S.E.2d 693 (1984)). It is immaterial that the written covenant is executed after the employee starts to work, so long as the terms incorporated therein were agreed upon at the time of employment. *Id.* (citing *Stevenson v. Parsons*, 96 N.C. App. 93, 97, 384 S.E.2d 291, 293 (1989)).

## C.

## BREACH OF FIDUCIARY DUTY

{64} "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp,* 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) (citing *Curl v. Key*, 311 N.C. 259, 264, 316 S.E.2d 272, 275 (1984)).

{65} In *Camp,* the Court defined such a relationship as one in which "'there has been a special confidence reposed . . . on one side, and *resulting domination and influence on the other.*'" *Id.* at 651–52, 548 S.E.2d at 707–08 (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)) (emphasis in original).

{66} As a general rule, "'the relation of employer and employee is not one of those regarded as confidential.'" *Id.* at 652, 548 S.E.2d at 708 (quoting *King v. Atlantic Coast Line R.R. Co.*, 157 N.C. 44, 72 S.E. 801 (1911)). Even when an employee is entrusted with substantial managerial authority, a fiduciary relationship will not exist absent evidence that such authority led to the employer being subjugated to the "improper influences or domination of [its] employee." *Id.*

{67} In North Carolina, corporate officers and directors owe fiduciary duties to the corporation. *Pierce Concrete, Inc. v. Cannon Realty & Constr. Co.*, 77 N.C. App. 411, 413–14, 335 S.E.2d 30, 31 (1985) (citing *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551 (1983)). More specifically, the law requires officers and directors to discharge their duties "(1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(3) In a manner [they] reasonably believe[] to be in the best interests of the corporation." N.C. Gen. Stat. §§ 55-8-30(a), 55-8-42(a) (2005).

D.

AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

{68}    It remains an open question whether North Carolina law recognizes a claim for aiding and abetting breach of fiduciary duty.

{69}    The reason for doubt is that the sole North Carolina appellate decision recognizing such a claim involved allegations of securities fraud, and its federal underpinnings were subsequently overruled by the United States Supreme Court. *See Sompo Japan Ins. Co., v. Deloitte & Touche, LLP,* 2005 NCBC 2 ( N.C. Super. Ct. June 10, 2005), http://www.ncbusinesscourt.net/opinions/2005%20NCBC%202. htm (discussing *Blow v. Shaughnessy,* 88 N.C. App. 484, 364 S.E.2d 444 (1988) and *Central Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994)). *But see Equitable Life Assurance Soc'y of the U.S. v. Am. Bankers Ins. Co. of Fla.,* No. 88-535-CIV-5-H, 1995 U.S. Dist. LEXIS 10880, at *34 (E.D.N.C. May 12, 1995) (stating that North Carolina would still recognize a claim for aiding and abetting breach of fiduciary duty based solely on tort principles); *In re Lee Memory Gardens, Inc.,* 333 B.R. 76, 80 (Bankr. M.D.N.C. 2005) (stating that "North Carolina law recognizes a cause of action for aiding and abetting breach of fiduciary duty" and citing *Blow v. Shaughessy* for that proposition).

{70}    Even assuming North Carolina law continues to recognize a claim for aiding and abetting a breach of fiduciary duty, it applies only to third parties who do not stand in a fiduciary relationship to the alleged victim, but who provide substantial assistance toward accomplishing the alleged breach. *Sompo,* slip. op. at ¶¶ 10–11.

E.

UNFAIR AND DECEPTIVE TRADE PRACTICES

{71}    The elements of a claim alleging a violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat § 75.1-1 (2005) ("UDTPA"), are "(1) defendant[] committed an unfair or deceptive act or practice, (2) in or affecting

commerce, and (3) plaintiff was injured as a result." *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 439, 617 S.E.2d 664, 671 (2005) (citing *Edwards v. West*, 128 N.C. App. 570, 574, 495 S.E.2d 920, 923 (1998)).

{72}    The UDTPA defines "commerce" broadly, to include "all business activities, however denominated", but not "professional services rendered by a member of a learned profession."  N.C. Gen. Stat. § 75-1.1(b) (2005).

{73}    Courts apply a two-part test when considering the UDTPA's learned profession exemption.  "First, the person or entity performing the alleged act must be a member of a learned profession.  Second, the conduct in question must be a rendering of professional services." *Reid v. Ayers,* 138 N.C. App. 261, 266, 531 S.E.2d 231, 235 (2000) (citations omitted).

{74}    In considering facts related to the second prong of this test, "the crucial inquiry [is] whether the [particular function or conduct is] a necessary part of the [professional] services provided." *Id.* at 267, 531 S.E.2d 231, 235 (citing *Cameron v. New Hanover Mem. Hosp.,* 58 N.C. App. 414, 446–47, 293 S.E.2d 901, 920–21 (1982)).

{75}    Finally, proof of an independent tort generally is sufficient to make out make out a separate UDTPA claim. *See Sara Lee Corp. v. Carter,* 351 N.C. 27, 31–33, 519 S.E.2d 308, 311–12 (1999) (finding that the breach of a fiduciary duty by an employee also gave rise to a UDTPA claim); *Governor's Club, Inc. v. Governors Club Ltd. P'ship.,* 152 N.C. App. 240, 250, 567 S.E.2d 781, 788 (2002) ("Allegations sufficient to allege constructive fraud are likewise sufficient to allege unfair and deceptive trade practices."); *Norman W. Drouillard & Print Purchasing Consultants, Inc. v. Keister Williams Newspaper Servs., Inc.,* 108 N.C. App. 169, 171–73, 423 S.E.2d 324, 326–27 (1992) (holding that a violation of the Trade Secrets Protection Act may also be a violation of the UDTPA); *Roane-Barker v. Se. Hosp. Supply Corp.,* 99 N.C. App. 30, 41, 392 S.E.2d 663, 670 (1990) (holding that a claim alleging tortious interference with contract also makes out a UDTPA violation).

F.

## MISAPPROPRIATION OF TRADE SECRETS

{76}     North Carolina's Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152–157 (2005) (the "TSPA"), defines a trade secret as business or technical information that "derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development . . . and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  N.C. Gen. Stat. § 66-152(3)(a)–(b).

{77}     Proper factors to consider when determining whether an item is a trade secret are:

> (1) the extent to which [the] information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard [the] secrecy of the information; (4) the value of [the] information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*State ex rel. Utilities Comm'n v. MCI Telecomms., Corp.*, 132 N.C. App. 625, 634, 514 S.E.2d 276, 282 (1999) (quoting *Wilmington Star News v. New Hanover Reg'l Med. Ctr.,* 125 N.C. App. 174, 182, 480 S.E.2d 53, 57 (1997)).

{78}     While customer lists may sometimes be afforded trade secret protection, *see Norman W. Drouillard & Print Purchasing Consultants, Inc. v. Keister Williams Newspaper Servs., Inc.,*  108 N.C. App. 169, 173, 423 S.E.2d 324, 327 (1992), courts will not grant relief under the TSPA where the list consists of information that is easily accessible or can be retrieved by reviewing public information.  *Combs & Assocs. v. Kennedy,* 147 N.C. App. 362, 370–71, 555 S.E.2d 634, 640 (2001) (citing *Novacare Orthotics & Prosthetics E., Inc. v. Speelman,* 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000)).

{79}    The TSPA defines "misappropriation" as the "acquisition, disclosure, or use of a trade secret of another **without express or implied authority or consent** . . . ." N.C. Gen. Stat. § 66-152(1) (emphasis added).[10]

G.

TORTIOUS INTERFERENCE WITH CONTRACT

{80}    To establish a claim for tortious interference with contract, a plaintiff must show: (1) a valid contract between it and a third person that confers upon the plaintiff a contractual right against a third person, (2) the defendant knows of the contract, (3) the defendant intentionally induces the third person not to perform the contract, (4) and in doing so the defendant acts without justification, (5) resulting in actual damage to the plaintiff. *United Labs, Inc. v. Kuykendall,* 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

{81}    With respect to the fourth element of this tort, "[t]he interference is 'without justification' if the defendant's motives for procuring termination of the employment contract were 'not reasonably related to the protection of a legitimate business interest' of the defendant." *Privette v. Univ. of N.C.*, 96 N.C. App. 124, 134, 385 S.E.2d 185, 190 (1989) (quoting *Smith v. Ford Motor Co.*, 289 N.C. 71, 94, 221 S.E.2d 282, 292 (1976)).

{82}    A competitor may hire an employer's former employees without being liable for tortious interference with contract. *Peoples Security Life Ins. Co. v. Hooks*, 322 N.C. 216, 221–22, 367 S.E.2d 647, 650–51 (1988). For example, merely offering an employee the opportunity to terminate an at-will employment relationship or even locating that employee in a territory where he may be induced to breach a non-competition agreement is by itself not enough to make out a claim of tortious interference. *Id.* at 222, 367 S.E.2d at 650.

{83}    On the other hand, where a party directly entices another to breach his contractual commitments (by, for example, unlawfully encouraging a new employee

---

[10] Plaintiffs also purport to allege common law claims for misappropriation of trade secrets. Plaintiffs' Complaint, however, does not allege (and the Court is unable to discern) any relevant evidentiary distinction between a claim alleging common law misappropriation and one alleging misappropriation under the TSPA.

to solicit his prior customers or use proprietary information to compete in violation of valid covenants prohibiting the same), a claim for tortious interference with contract may lie. *Roane-Barker v. Se. Hosp. Supply Corp.*, 99 N.C. App. 30, 38–39, 392 S.E.2d 663, 668–669 (1990).

## H.
## CIVIL CONSPIRACY

{84} Where a party seeks "recovery for injury caused by acts committed pursuant to a conspiracy, . . . the combination or conspiracy charged does no more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under the proper circumstances the acts of one may be admissible against all." *Henry v. Deen,* 310 N.C. 75, 86–87, 310 S.E.2d 326, 334 (1984) (citing *Shope v. Boyer*, 268 N.C. 401, 150 S.E.2d 771 (1966)).

{85} The gravamen of the action, however, is the resultant injury, and not the conspiracy itself. *Shope*, 268 N.C. at 405, 150 S.E.2d at 773–74. To create civil liability for conspiracy, there must have been a wrongful act resulting in injury to another committed by one or more of the conspirators pursuant to the common scheme and in furtherance of the objective. *See id.*

## VII.
## ANALYSIS
## A.
## FIRST CAUSE OF ACTION-BREACH OF CONTRACT

{86} Plaintiffs' First Cause of Action seeks relief for the alleged breach of two covenants not to compete. Plaintiffs allege that (1) the covenants are unambiguous,

and (2) the undisputed facts show each Defendant breached the same.[11]

{87}    Defendants respond that (1) Mark McGeough nullified the covenants during his tenure as Battleground's sole shareholder, officer, and director, (2) the doctrine of laches bars Plaintiffs from objecting to Mark McGeough's decision to nullify the covenants, and (3) the covenants fail for lack of consideration.

{88}    Alternatively, Defendants argue they are entitled to summary judgment because the plain language of the covenants show they do not apply where, as here, an employee is not terminated but instead resigns.

{89}    The Court addresses these contentions in turn.

1.

MARK MCGEOUGH'S NULLIFICATION OF THE COVENANTS

{90}    Defendants allege that when Mark McGeough assumed the roles of sole shareholder, officer, and director of Battleground, he necessarily obtained unfettered discretion to nullify the covenants at issue.  Defendants are correct, but only with respect to Battleground's claim for breach of contract.

{91}    All corporations organized under North Carolina law, including those entities where power and authority are closely held, are governed by the requirements of the North Carolina Business Corporation Act, N.C. Gen. Stat. §§ 55-1-01–55-17-05 (2005) (the "Business Corporation Act").

{92}    Among other things, the Business Corporation Act prescribes general standards of conduct for a corporation's officers and directors.  As applied here, when Mark McGeough became the sole director and officer of Battleground, he undertook to discharge his duties "(1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

---

[11] Plaintiffs contend the ASA provides a separate basis for relief against Defendants because it too imposes restrictions regarding confidentiality and competition.  This argument fails on at least five levels: first, Plaintiffs' Complaint does not allege a breach of the ASA; second, the ASA does not identify the confidential information it purports to protect; third, the ASA provides expressly that the then President of Battleground (who was not Mark McGeough) was executing the ASA solely in his representative capacity; fourth, the ASA attached to Plaintiffs' motion for summary judgment does not name either Defendant as a party to its terms; and fifth, Defendants never signed the attached ASA nor, it appears, any other version of that document.  (Pls. Mot. Summ. J. Ex. 1; Defs. Mot. Summ. J. Ex. Q.)

(3) In a manner he reasonably believe[d] to be in the best interests of the corporation."  *Id.* §§ 55-8-30(a), 55-8-42(a).

{93}    As to this third point, the Business Corporation Act precludes a director from engaging in so-called "conflict of interest" transactions in which the director has either a direct or indirect personal interest.  *Id.* § 55-8-31(a).

{94}    Although the Act does not define a "direct" conflict of interest, the point, as one commentator has explained, is left to "common sense."  Russell M. Robinson, II, *Robinson on North Carolina Corporation La*w 15-3 (7th ed. 2006).  There is little doubt, however, that a director has a "direct" conflict of interest where either he or some member of his immediate family has a material financial interest in the transaction.  *Id.* (citing Model Act official comment 8.31 ¶ 5 (1984)).

{95}    A conflict of interest transaction is voidable by the corporation unless it is approved by a proper vote of disinterested directors or shareholders or the transaction is otherwise fair to the corporation.  N.C. Gen. Stat. § 55-8-31(a).  The burden of proof on the fairness issue is on "the party seeking to sustain the transaction."  Robinson, *supra*, § 15.01[4]; *see also Schwartzbach v. Apple Baking Co.,* 109 N.C. App. 216, 219, 426 S.E.2d 438, 440 (1993) (analyzing prior version of the statute).

{96}    Moreover, these corporate governance principles do not evaporate merely because one person has sole control of a corporation.  *Cf.* N.C. Gen. Stat. § 55-2-03(c) (emphasizing that no provision in the Business Corporation Act or any prior act "shall be construed to require that a corporation have more than one shareholder"); *Id.* § 55-8-01(c) (allowing a corporation to dispense with or limit the authority of a board of directors and transfer authority for performing such duties to one individual).

{97}    To the contrary, so long as corporate formalities are observed, a "one-person" corporation remains an entity separate and distinct from its sole shareholder.  On the other hand, where control leads to the abandonment of corporate formalities such that the corporate entity is a mere instrumentality of the individual shareholder, and where such control is used to commit a fraud or other

wrong, North Carolina courts will not hesitate to pierce the corporate veil to reach a controlling shareholder's personal assets. *See generally Glenn v. Wagner,* 313 N.C. 450, 454–55, 329 S.E.2d 326, 330–31 (1985) (summarizing the "instrumentality rule" for piercing the corporate veil); *see also Strawbridge v. Sugar Mountain Resort, Inc.,* 320 F. Supp. 2d 425, 439 (W.D.N.C. 2004) (denying summary judgment for defendant on piercing claim, in part because plaintiff's evidence showed that sole shareholder was also the corporation's sole director and president).

{98} It is difficult to conceive of a transaction more fraught with conflict than one where an officer or director of a corporation purports to dispose of a corporate asset by rescinding contractual obligations that otherwise bind both the director and his wife to refrain from competing with that same entity. That said, Plaintiffs in this case have not alleged a piercing claim. And it seems obvious (at least to the Court) that the provisions related to conflict of interest transactions in the Business Corporation Act are primarily intended to protect minority shareholders from overreaching by majority shareholders.

{99} The question presented by the instant facts, however, is what constraints, if any, are imposed on the actions of an individual *vis-à-vis* a corporation's assets where that individual is also the corporation's sole shareholder, officer, and director.

{100} The Court has found no North Carolina authority on the issue. The consensus in other jurisdictions, however, appears to be that a sole shareholder of a corporation is generally free to dispose of corporate assets as he sees fit, except where such actions harm or defraud the corporation's creditors, or otherwise violate public policy. *Anderson v. Benson,* 394 N.W.2d 171, 175 (Minn. Ct. App. 1986); *accord L.R. Schmaus Co. v. Commissioner,* 406 F.2d 1044, 1045 (7th Cir. 1969); *Household Reinsurance Co., Ltd., v. Travelers Ins. Co.,* No. 91 C 1308, 1992 U.S. Dist. LEXIS 1006 (E.D. Ill. January 31, 1992).

{101} Applying this principle here, the Court holds that Battleground has no claim for breach of contract. When he nullified the covenants purporting to bind Defendants, Mark McGeough was Battleground's sole shareholder. As such, absent harm to a creditor or a violation of public policy, he was free to dispose of

Battleground's assets as he saw fit.   For that reason, and notwithstanding the attempt by Battleground's new management to rescind Mark McGeough's action, the Court holds that Battleground—through its then sole shareholder—consented to the nullification of the covenants.

{102}   Plaintiffs argue, however, that (1) the ASA vests title to the covenants in VetCor, not Battleground, and (2) Mark McGeough conceded as much in his deposition.  (Pls. Reply Mot. Summ. J. 2.)  Plaintiffs are incorrect.

{103}   In fact, the ASA says only that VetCor retains title in all "inventory . . ., equipment, furnishings and supplies reasonably necessary for the efficient operation of the Practice."  (Pls. Mot. Summ. J. Ex. 1.)  What's more, the ASA goes out of its way to establish a clear demarcation between the administrative services that VetCor as Manager provides and the professional services rendered by Battleground's employee veterinarians.

{104}   It is true that the ASA vests the Manager with control of Battleground's administrative operations.  But managerial control is not synonymous with ownership of a corporation's assets.  Moreover, Section 2.4 of the ASA states that Battleground is "solely responsible for setting all professional standards of the Practice and shall be responsible for employment, supervision and discharge of all Professional Personnel and that the Manager shall have no responsibility for the conduct or supervision of the professional services of the Practice."  (Pls. Mot. Summ. J. Ex. 1.)

{105}   If anything, this language suggests that Battleground (acting through its owners) has unfettered discretion to determine how and whether it will enforce covenants that might otherwise bind its employee veterinarians.

{106}   Nor do the deposition excerpts cited by Plaintiffs in their reply brief help their cause, as they show only that Mark McGeough understood he would not own Battleground's assets once he resigned his employment.  (Pls. Reply Mot. Summ. J. 2 (citing Mark McGeough Dep. 80–82.))  McGeough did, however, have sole ownership of Battleground when he nullified the covenants.

{107} On these facts, the Court concludes that Battleground (and not VetCor) owned the covenants at issue. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as to Battleground's claim for breach of contract.

{108} The Court reaches a different result as to VetCor's claim for breach of contract.

{109} Mark McGeough's covenant specifically identifies VetCor as an additional party. (Pls. Mot. Summ. J. Ex. 2.) And Sarah McGeough's covenant states that the "Company" identified as a party therein, shall "include [Battleground] and its direct or indirect subsidiaries and affiliates." (Pls. Mot. Summ. J. Ex. 3.) Moreover, Plaintiffs' Verified Complaint alleges that Battleground is affiliated with the "VetCor family of veterinary facilities." (Compl. ¶ 7.)[12]

{110} The parties also agreed the covenants could not be modified or waived except by a writing signed by the party against whom the modification or waiver was being enforced. (Pls. Mot. Summ. J. Exs. 2–3.) Thus, even if Mark McGeough could nullify Battleground's rights under the covenants, his action could not work a lawful termination of VetCor's rights.

{111} The result is the same even if VetCor is considered a third-party beneficiary of the contract rather than an additional party.

{112} North Carolina courts have long recognized the rights of a third party to sue for breach of a contract executed for its benefit. *See e.g., Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 329 N.C. 646, 651, 497 S.E.2d 178, 181 (1991).

{113} In determining whether a third party has a right of action on a contract, the primary inquiry is one of intent, namely whether the parties to the contract intended that the third party receive a benefit that may be enforced in court. *Id.* In making this determination, courts may consider circumstances surrounding the transaction as well as the language of the contract itself. *Id.*

---

[12] That VetCor did not sign the covenants is of no legal significance, as the requirement that a covenant not to compete be in writing is satisfied when the document is signed by the party against whom enforcement is sought. *Manpower of Guilford Co. v. Hedgecock,* 42 N.C. App. 515, 520, 259 S.E.2d 109, 113 (1979).

{114}    Here, both covenants refer to VetCor either directly or indirectly, indicating that the original parties intended to give VetCor the ability to enforce the covenants.  As such, the covenants could not be materially modified or changed to VetCor's detriment without its consent.  *Am. Trust Co. v. Catawba Sales & Processing Co.*, 242 N.C. 370, 380, 88 S.E.2d 233, 240 (1955).

{115}    Accordingly, Defendants are not entitled to summary judgment against VetCor on this ground.

2.

LACHES

{116}    Next, Defendants argue Plaintiffs should be barred from objecting to Mark McGeough's nullification of the covenants because of the doctrine of laches. The Court disagrees.

{117}    "In equity, where lapse of time has resulted in some change . . . in the relations of the parties which would make it unjust to permit the prosecution of the claim, the doctrine of laches will be applied."  *Teachey v. Gurley*, 214 N.C. 288, 294, 199 S.E. 83, 88 (1938).

{118}    To prevail on the affirmative defense of laches, the party asserting the defense bears the burden of proving that

> (1) the claimant knew of the existence of the grounds for the claim; (2) the delay was unreasonable and must have worked to the disadvantage, injury or prejudice of the party asserting the defense; [and] (3) the delay of time has resulted in some change . . . in the relations of the parties.

*Town of Cameron v. Wadell,* 150 N.C. App. 174, 177, 563 S.E.2d 198, 201 (2002).

{119}    "[H]owever, the mere passage of time is insufficient to support a finding of laches.  The amount of delay required to establish laches depends on the facts and circumstances of each case."  *Id.* (citations omitted).

{120}    Plaintiffs' allege they had no knowledge of Mark McGeough's actions until after the lawsuit was filed and the purported nullification came to light in discovery.  (Defeo Dep. 145:6–147:3.)  The record also shows Plaintiffs attempted to

rescind the cancellations as conflict of interest transactions as soon as they became aware of them. (Defs. Mot. Summ. J. Ex. T.) On this record, there is no evidence of a significant delay, much less any delay that prejudiced Defendants.

{121} Accordingly, the Court **DENIES** Defendants' motion for summary judgment on VetCor's breach of contract claim based on laches.

3.

## FAILURE OF CONSIDERATION

{122} Defendants also argue Plaintiffs' breach of contract claim fails for lack of consideration. More specifically, Defendants allege (1) the covenants formed no part of their initial employment negotiations with Battleground, (2) they were not presented with the terms of their covenants until months after they began working for Battleground, and (3) as a result, Plaintiffs cannot rely on the initial offer of employment as consideration for the covenants.

{123} Plaintiffs respond that Defendants' testimony regarding the date they signed the covenants is barred by the parol evidence rule. The Court disagrees.

{124} Generally, the parol evidence rule prohibits "the consideration of evidence as to anything which happened prior to or simultaneously with the making of a contract which would vary the terms of the agreement." *Harrell v. First Union Nat. Bank*, 76 N.C. App. 666, 667, 334 S.E.2d 109, 110 (1985).

{125} However, the rule does not apply to written recitals of fact in a contract, including the date upon which the agreement took effect. *See Cutlar v. Cutlar*, 3 N.C. 157 (1801) (allowing a party to introduce evidence that a deed was delivered on a different day than that evidenced in the written document).[13]

{126} In this instance, the dates contained in the covenants are merely prima facie evidence of the date they were executed. *Cf. Weiss v. Woody*, 80 N.C. App. 86, 92, 341 S.E.2d 103, 107 (1986) (allowing parol evidence to show the consideration recited in the contract was not actually received since the recital acted merely as a

---

[13] Although *Cutlar v. Cutlar* appears on page 157 of Volume 3 of the North Carolina Reports, the case is cited by Lexis as 3 N.C. 334.

receipt in this context, providing prima facie evidence of the amount actually paid). As such, they may be disputed without running afoul of the parol evidence rule because any contradictory evidence as to the execution dates does not vary the *terms* of the covenants but simply sheds light on a relevant fact.

{127} Here, there is a factual dispute as to when Defendants executed the covenants and whether they were in fact aware of the covenants' terms before they began work for Battleground.

{128} Plaintiffs rely on the covenants themselves, which show dates of execution contemporaneous with the dates Defendants began working for Battleground. Defendants, on the other hand, allege they were not presented with the covenants when they accepted employment with Battleground and did not execute the covenants on the dates set forth therein. Consistent with that view of the facts, Sarah McGeough has presented evidence showing inconsistent dates on the various employment documents she signed.

{129} "When the relationship of employer and employee is established before the covenant not to compete is signed there must be consideration for the covenant such as a raise in pay or a new job assignment." *Whittaker Gen. Med. Corp. v. Daniel,* 324 N.C. 523, 527, 379 S.E.2d 824, 827 (1989) (citing *Chemical Corp. v. Freeman,* 261 N.C. 780, 136 S.E.2d 118 (1964)).

{130} On the other hand, if a covenant not to compete "is a part of an original verbal employment contract, it will be considered to be based on valuable consideration." *Young v. Mastrom, Inc.,* 99 N.C. App. 120, 123, 392 S.E.2d 446, 448 (1990) (citing *Robins & Weill v. Mason*, 70 N.C. App. 537, 320 S.E.2d 693 (1984)). Moreover, a mere delay in reducing an otherwise valid agreement to writing is not fatal to prosecution of a claim for breach of the covenant. *Id.*

{131} Because there are genuine issues of material fact as to whether the parties agreed to the covenants on or after the date of employment, this issue must be resolved by a jury. Accordingly, the Court **DENIES** the parties' cross motions for summary judgment on this ground.

4.

## AMBIGUITY OF CONTRACT LANGUAGE

{132}   Both sides insist the language of the covenants unambiguously supports summary judgment in their favor as to the breach of contract claim.  In fact, because the language is anything but clear, a jury must determine the intent of the parties.

{133}   The covenants purport to bar Defendants from certain competitive activity for twelve (12) months from the date of **termination** of Defendants' employment. (Pls. Mot. Summ J. Exs. 2–3.)  There is no dispute, however, that Defendants resigned their employment with Battleground.  (Compl. ¶ 20.)

{134}   In *Novacare Orthotics,* the Court of Appeals held that a covenant not to compete containing virtually similar language was ambiguous, in that it could not be construed as a matter of law to apply when a defendant resigned his employment.  *Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 476, 528 S.E.2d 918, 921 (2000).

{135}   Plaintiffs contend Mark McGeough's attempt to nullify the covenants distinguishes this case from *Novacare* because it shows Defendants actually believed the covenants applied regardless of how they ended their employment. Conversely, Defendants minimize the evidentiary import of Mark McGeough's actions and argue the covenants should be construed against Plaintiffs because they drafted them.  *See e.g. Chavis v. S. Life Ins. Co.,* 318 N.C. 259, 262, 347 S.E.2d 425, 427 (1986).  While both assertions have some merit, neither is sufficient to dispose of the issue as a matter of law.

{136}   The facts of the present case are not distinguishable in any material way from *Novacare.*  Thus, because the proper interpretation of the covenants is a question of fact for a jury, the Court denies the parties' cross-motions for summary judgment on this ground.

{137}   In sum, the Court **GRANTS** Defendants' motion for summary judgment as to Battleground's claim for breach of contract, but **DENIES** the cross-motions as to VetCor's claim.

## B.

## SIXTH CAUSE OF ACTION-TORTIOUS INTERFERENCE
## WITH CONTRACT[14]

{138}  The Court **GRANTS** Defendants' motion for summary judgment as to Battleground's claim alleging tortious interference with contract but otherwise **DENIES** the cross-motions.

{139}  To prevail on this claim, Plaintiffs must show (among other things) that each Defendant induced the other to breach a valid contract that existed between Plaintiffs and the other Defendant.

{140}  Because the Court has already determined that Battleground has no valid claim for breach of contract as to the covenants, it follows that Battleground's claim for tortious interference with contract also fails.

{141}  VetCor's separate claim for tortious interference with contract, however, depends in part on whether the covenants apply to Defendants on the facts presented.[15]  Because that issue is hotly disputed, resolution of VetCor's related tort claim must await a trial.

## C.

## SECOND CAUSE OF ACTION—BREACH OF FIDUCIARY DUTY

{142}  Plaintiffs' Second Cause of Action alleging breach of fiduciary duty is unusual because of the facts discussed previously regarding Mark McGeough's sole control of Battleground during the relevant period.

{143}  The premise for the claim stems from Defendants' alleged misappropriation of Battleground's proprietary information and assets to develop their competitive practice.

{144}  As to this claim, the undisputed facts show Mark McGeough spent at least some of his working hours while employed by Battleground developing his business

---

[14] The Court has grouped related claims for purposes of its analysis, and thus has considered some claims out of order.

[15] As to the fourth element of this tort, Defendants' conduct falls somewhere between what is authorized by *Peoples* as lawful competition and what is barred by *Roane-Barker* as tortious interference with contract.  Regardless, as there are other issues related to the claim that must be resolved by a jury, the Court declines to decide this question at summary judgment.

plan for Birkdale and arranging financing.  McGeough also solicited Battleground employees to join his new practice.

{145}  Further, both Defendants took Battleground's customer lists, along with records documenting spending patterns for some of Battleground's clients, which Defendants then used to develop their initial marketing program.  Defendants also used Battleground's resources to prepare customer lists and address labels, which they then used to create mailings announcing the opening of Birkdale.

{146}  Finally, Mark McGeough attempted to nullify employment covenants with Battleground that he feared would prevent Defendants from opening their new practice.

{147}  Defendants make no real effort to refute these facts.  Instead, Defendants argue (1) they owed no fiduciary duties to VetCor, (2) Mark McGeough cannot be guilty of breach of fiduciary duty as to Battleground, since his actions could only have harmed him as Battleground's sole shareholder, (3) Sarah McGeough owed no fiduciary duty to Battleground, as she was a mere employee and not an officer of the company, and (4) Sarah McGeough cannot be guilty of breaching a fiduciary duty to Battleground where its sole shareholder at the time approved of her actions.

{148}  The Court **GRANTS** Defendants' motion for summary judgment as to Plaintiff VetCor.  To the extent VetCor alleges a claim for breach of fiduciary duty, it has presented no evidence describing the nature of its fiduciary relationship with either Defendant.

{149}  There is evidence that VetCor is Battleground's creditor by virtue of its role as Manager of Battleground's clinics.  And of course, it is undisputed that Mark McGeough was for a time Battleground's sole director.

{150}  "As a general rule, [however,] directors of a corporation do not owe a fiduciary duty to creditors of the corporation." *Keener Lumber Co. v. Perry,* 149 N.C. App. 19, 29–30, 560 S.E.2d 817, 824 (2002) (quoting *Whitley v. Carolina Clinic, Inc.,* 118 N.C. App. 523, 526, 455 S.E.2d 896, 899 (1995)).

{151}  In certain circumstances, however, corporate directors may owe a fiduciary duty to creditors of the corporation.  The circumstances under which a

director's fiduciary obligations extend to creditors have been limited to those situations "amounting to a 'winding up' or dissolution of the corporation." *Id.* at 31, 560 S.E.2d at 825 (quoting *Whitley*, 118 N.C. App. at 528, 455 S.E.2d at 900).

{152} VetCor has presented no such evidence here and thus, no basis for proceeding on a claim alleging breach of fiduciary duty against either Defendant.

{153} The Court also **GRANTS** Defendants' motion for summary judgment as to Battleground's claim alleging breach of fiduciary duty.

{154} Before resigning her employment, Sarah McGeough served as Chief of Staff for Battleground's Charlotte clinic. As such, there is little doubt that Battleground reposed a substantial level of confidence and authority in this Defendant. But what is missing from Battleground's proof is any evidence that Sarah McGeough's position resulted in her influencing or dominating her employer. *See Dalton v. Camp,* 353 N.C. 647, 651–52, 548 S.E.2d 704, 707–08 (1984).

{155} Without such evidence, there is no basis for concluding that a fiduciary relationship existed between these parties, and thus, no basis for finding a breach of fiduciary duty.

{156} In any event, there is a more fundamental reason why Defendants are not liable for breach of fiduciary duty *vis-à-vis* Battleground.

{157} Mark McGeough's fiduciary obligation to Battleground arises from his role as Battleground's sole officer and director. As such, he was obligated to discharge his duties in good faith, with due care, and in a manner consistent with Battleground's best interests. N.C. Gen. Stat. §§ 55-8-30 (a), 55-8-42(a).

{158} As noted earlier, these statutory obligations are intended to prevent those in control of a corporation from profiting at the expense of those in the minority. In this case, however, there were no other shareholders to whom Mark McGeough owed a duty of loyalty.

{159} Thus, to hold that Mark McGeough breached a fiduciary duty would mean only that he breached a duty to himself. Because this conclusion is a *non sequitur,* the Court declines to adopt it. *See In re Safety Int'l Inc.,* 775 F.2d 660, 662 (5th Cir. 1985) (finding no breach of fiduciary duty for alleged usurpation of corporate

opportunity where the only two shareholders of the corporation ratified the transaction and no creditors were prejudiced); *In re Tufts Electronics, Inc.,* 746 F.2d 915, 917 (1st Cir. 1984) (holding that the sole shareholder, president, and director of corporation "cannot be accused of defrauding or concealing information from himself . . ."); *In re Mediators, Inc.,* 1996 U.S. Dist. LEXIS 7639, at*26–27 (S.D.N.Y. June 4, 1996) (citing *Tufts* for the proposition that a corporation cannot assert a claim for diversion of a corporate opportunity where the sole shareholder consented to the same); *Comm. of Unsecured Creditors of Specialty Plastic v. Doemling,* 127 B.R. 945, 952 (W.D. Pa. 1991) (holding that absent harm to a corporate creditor, the president and sole shareholder of a corporation does not breach his fiduciary duty to the corporation by usurping a corporate opportunity because, as sole shareholder, he necessarily "consented to his own acquisition of the opportunity"); *Pittman v. Am. Metal Forming Corp.,* 649 A.2d 356, 359 (Md. 1994) (holding that a sole shareholder is not liable for usurpation of corporate opportunity when no minority shareholders or creditors are harmed).

{160}  Similarly, even if Sarah McGeough owed a fiduciary duty to Battleground, she cannot be liable for a breach of said duty when the company's sole shareholder approved her actions.

{161}  Accordingly, the Court **GRANTS** summary judgment for Defendants as to this claim.

D.

THIRD CAUSE OF ACTION-AIDING AND ABETTING<br>BREACH OF FIDUCIARY DUTY

{162}  The Court also **GRANTS** Defendants' motion for summary judgment as to the claim alleging aiding and abetting a breach of fiduciary duty.  Even assuming such a claim exists under North Carolina law, liability for aiding and abetting presupposes that the principals are liable for the underlying tort.  The Court having already determined otherwise, this claim fails as a matter of law.

## E.

## FIFTH CAUSE OF ACTION-MISAPPROPRIATION OF TRADE SECRETS

{163}   Plaintiffs' allege in their Fifth Cause of Action that Defendants misappropriated Battleground's client mailing lists and records, information that Plaintiffs insist warrants protection under the TSPA.

{164}   The Court **GRANTS** Defendants' motion for summary judgment on this claim.

{165}   The Court concludes that VetCor has no claim for trade secrets protection as the confidential information at issue in this case belongs only to Battleground.

{166}   As to Battleground's claim, the TSPA defines a trade secret as business or technical information that "derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development . . . and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  N.C. Gen. Stat. § 66-152(3)(a)–(b).

{167}   A significant factor in determining whether certain information is properly classified as a trade secret is "the ease or difficulty with which the information could properly be acquired or duplicated" by lawful means.  *Wilmington Star News v. New Hanover Reg. Med. Ctr.,* 125 N.C. App. 174, 182, 480 S.E.2d 53, 57 (1997).

{168}   Moreover, a claim for misappropriation of trade secrets will lie only where the information is acquired, disclosed, or used "**without express or implied authority or consent** . . . ."  N.C. Gen. Stat. § 66-152(1) (emphasis added).

{169}   The Court doubts that Defendants' use of a client mailing list, standing alone, is sufficient to make out a TSPA claim, as it appears Defendants could have easily replicated this information through lawful means.  *See Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000) (holding that a mailing list is not a trade secret where the information is easily retrievable through a local telephone book).

{170}   Battleground appears to stand on firmer footing as to Defendants' use of its records regarding client spending patterns, as Defendants would be hard-pressed to show that such information could be duplicated or retrieved by lawful means.

{171}   Unfortunately for Battleground, the alleged "misappropriation" of this information occurred with the active acquiescence and consent of Mark McGeough, who was in sole control of Battleground until 23 July 2005 and who remained its sole shareholder until 18 August 2005, a full two weeks after Defendants opened their new veterinary practice.

{172}   Accordingly, as with its claim alleging breach of fiduciary duty, on these facts, Battleground's TSPA claim fails as a matter of law.

F.

FOURTH CAUSE OF ACTION-UDTPA CLAIM

{173}   Read narrowly, Plaintiffs' Fourth Cause of Action alleging a UDTPA claim is premised on the same facts supporting its claim that Defendants misappropriated certain trade secrets.

{174}   The Court has already determined Defendants are entitled to summary judgment as to Plaintiffs' trade secrets claim.  Accordingly, it would normally dismiss this claim as well.

{175}   Summary judgment, however, is a drastic remedy that should be granted cautiously.  To that end, the Court must apply an indulgent standard to a party's claim and dismiss it only where there is no ground for recovery as a matter of law. *Lincoln v. Beuche,* 166 N.C. App. 150, 155, 601 S.E.2d 237, 243 (2004).

{176}   Here, there remains a genuine issue for trial as to VetCor's claim alleging tortious interference with contract.[16]  Because a claim alleging tortious interference with contract is also sufficient to make out a UDTPA violation, *see Roane-Barker v. Se. Hosp. Supply Corp.,* 99 N.C. App. 30, 41, 392 S.E.2d 663, 670 (1990), VetCor's UDTPA claim also survives summary judgment, unless there is some other ground for dismissing it.

---

[16] Because Battleground's other substantive claims have all been dismissed, it has no grounds for pursuing a UDTPA claim.

{177}  Defendants contend that dismissal of the UDTPA claim is appropriate because their conduct is protected by the statute's learned professional exemption.

{178}  Plaintiffs do not dispute that Defendants, as veterinarians, are members of a learned profession.  The question then is whether Defendants' alleged tortious interference with VetCor's contract rights involves the rendering of veterinary services.

{179}  In *Reid v. Ayers,* 138 N.C. App. 261, 531 S.E.2d 231 (2000), the Court of Appeals applied the learned professional exemption to dismiss a UDTPA claim lodged against an attorney whose practice encompassed debt collection.  According to the court,

> [d]ebt collection, along with the collection of any attorney's fees incurred as a penalty, is a necessary part of the practice of debtor-creditor law.  Because defendants were engaged in that very practice here, they were rendering a professional legal service.  Accordingly, their acts fall within the learned profession exemption.

*Id.* at 267, 531 S.E.2d at 236.

{180}  The court in *Reid,* however, noted an outer limit to the scope of the learned professional exemption.  First, the court emphasized that "[a]dvertising is not an essential component of the rendering of legal services and thus would fall outside the exemption."  *Id.*  Second, while eschewing a bright line test, the court offered the following analysis:

> [W]e think that the exemption applies anytime an attorney or law firm is acting within the scope of the traditional attorney-client role.  It would not apply when the attorney or law firm is engaged in the entrepreneurial aspects of legal practice that are geared more towards their own interests, as opposed to the interests of their clients.

*Id.*

{181}  Left unclear is the result that obtains where, as is the case here, the evidence as to a professional's conduct admits of two motives.

{182}  On the one hand, Plaintiffs' evidence is that Defendants induced each other to unlawfully interfere with VetCor's contract rights by (1) developing a

competing practice, (2) soliciting Battleground's clients and employees, and (3) misappropriating Battleground's client list and associated records to market the opening of their new practice. These acts, according to Plaintiffs, have nothing whatever to do with the rendering of professional services.

{183} Conversely, Defendants' evidence is they had developed long-standing professional relationships with the clients they saw while working for Battleground, and their actions in developing and marketing their new practice (while obviously benefiting their own interests) also gave these clients an opportunity to make the best choice for their veterinary needs.

{184} *Reid* does not address the legitimacy of a professional's conduct on these facts. Because the law on this issue is not settled, and because there remains a genuine issue of material fact as to Defendants' liability for tortious interference with contract, the Court defers ruling on this issue until trial.

{185} Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as to Battleground's Fourth Cause of Action, but otherwise **DENIES** the parties' cross-motions for summary judgment as to the claim.

G.

SEVENTH CAUSE OF ACTION-CIVIL CONSPIRACY

{186} As with the claim alleging a violation of the UDTPA, Plaintiffs' allegation of civil conspiracy focuses on the same facts supporting their claim that Defendants misappropriated trade secrets.

{187} Applying an indulgent standard to this allegation, however, the Court **DENIES** Defendants' motion for summary judgment as to VetCor's civil conspiracy claim, as a jury could find an agreement between the Defendants to interfere with VetCor's contract rights.

{188} The Court having dismissed all of Battleground's substantive claims in this case, it **GRANTS** Defendants' motion as to Battleground's claim of civil conspiracy.

# VIII.

## CONCLUSION

{189}   The Court **GRANTS** Defendants' motion for summary judgment as to all claims alleged by Battleground.

{190}   The Court **GRANTS** Defendants' motion for summary judgment as to VetCor's Second and Third Causes of Action alleging breach of fiduciary duty and aiding and abetting the same.

{191}   The Court **GRANTS** Defendants' motion for summary judgment as to VetCor's Fifth Cause of Action alleging misappropriation of trade secrets.

{192}   In all other respects, the parties' cross-motions for summary judgment are **DENIED**.


This the 19th day of October, 2007.